1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4      UNITED STATES OF AMERICA,

5               Plaintiff,          No: 1:24cr7

6       vs.

7      RICHARD ANTHONY REYNA DENSMORE,

8               Defendant.

9


10     Before:

11                  THE HONORABLE RAY KENT
                    U.S. Magistrate Judge
12                  Grand Rapids, Michigan
                    Monday, February 5, 2024
13            Arraignment, Initial Pretrial Conference,
                    Detention Proceedings
14
       APPEARANCES:
15
                    MR. MARK A. TOTTEN, U.S. ATTORNEY
16                  By:  MR. ADAM BARRETT TOWNSHEND
                    330 Ionia Avenue, NW
17                  P.O. Box 208
                    Grand Rapids, MI 49501-0208
18                  (616) 456-2510

19                       On behalf of the Plaintiff;

20                  FEDERAL PUBLIC DEFENDER
                    By:  MR. JAMES STEVENSON FISHER
21                  50 Louis Street, NW, Suite 300
                    Grand Rapids, MI 49503-2633
22                  (616) 742-7420

23                       On behalf of the Defendant.

24                  Also Present:  Reese McIntyre, FBI
                                   Benjamin Schultz, Probation Agent.
25
       TRANSCRIBED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

1        02/05/2024

2        2:25 p.m.

3            THE CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Ray Kent, United States Magistrate Judge, presiding.  Please be

6    seated.

7            THE COURT:  This is 1:24cr7, United States versus

8    Richard Densmore.  Mr. Townshend on behalf of the United

9    States.  Mr. Fisher on behalf of Mr. Densmore.  Three matters

10   set for hearing, an arraignment, a pretrial conference, and a

11   bond hearing.

12           Mr. Densmore, I remind you of your right to a lawyer.

13   When you were here last time you asked me to appoint a lawyer

14   and I appointed Mr. Fisher to represent you.  Have you had a

15   chance now to meet with him and discuss the case?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  Mr. Densmore, you don't have to stand up

18   when you answer my questions.  I appreciate the fact you did

19   but you don't have to.

20           All right.  Mr. Fisher, will Mr. Densmore waive the

21   reading of the indictment if I summarize the charges?

22           MR. FISHER:  Yes, Your Honor.  I have already reviewed

23   the indictment with him as well.

24           THE COURT:  Thank you.

25           As we covered last time, Mr. Densmore, the government

1    is bringing five criminal charges against you.  Count -- Count

2    1 is a crime that the government calls sexual exploitation of a

3    child.  The government claims that between September and

4    December of 2022, in Manistee County, you induced another

5    person to knowingly entice a child to engage in sexually

6    explicit conduct for the purpose of taking photographs or video

7    of that conduct, and this young girl did that, and the video is

8    identified in the Count and the government claims it was sent

9    to you over the Internet.

10           Count 2 charges conspiracy to commit that very same

11   act, and it is -- a conspiracy is a separate crime under

12   federal criminal law.  It's simply an agreement between two or

13   more people to commit a crime.  In this case the government

14   alleges that you entered into an agreement with this other

15   person.  Mother?  Father?  Mother?

16           MR. TOWNSHEND:  Just another person unknown to the

17   government at this time, Your Honor.

18           THE COURT:  Okay.  Another person to coerce this young

19   girl into producing the video, which is the basis of Count 1.

20           In Count 3 the government charges coercion and

21   enticement, claiming, again, that during that same September to

22   December '22 time period in Manistee County, you induced or

23   enticed another person to persuade this same young girl to

24   engage in sexual activity for which a person can be charged

25   with a criminal offense, which, of course, is sexual

1    exploitation of a child, the charge in Count 1.

2         Count 4, the government alleges that on February 2nd

3    of last year, in Manistee County, you possessed a number of

4    images or videos of -- containing child pornography, and that

5    these had been produced using materials which had crossed a

6    state line before coming into your possession.

7         Finally, in Count 5, the government charges another

8    possession of child pornography count.  It identifies a

9    specific file.  This was produced, shipped or transported using

10   a different cellular device, in this case an iPhone 6, also

11   manufactured in China.  Do you understand the five charges?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  If convicted, we said last time the

14   penalties -- Counts 1 and 2, the penalties are the same, 15 to

15   30 years in prison, a fine of up to $250,000, supervised

16   release of five years to life, special assessments, Count 1 in

17   the amounts of 105,000 and the third of up to 50,000, the same

18   as Count 2, mandatory restitution, and you would be required to

19   register as a sex offender.

20        Count 3, the penalties are 10 to life in prison.  The

21   same fine maximum.  The same supervised release period as

22   Counts 1 and 2, two special assessments, one of 100 and one of

23   5,000, mandatory restitution, register as a sex offender.

24        The penalties for the two possession counts, Counts 4

25   and 5, are the same.  That is up to 20.  So zero to 20 years in

1    prison.  The same maximum fine, supervised release period, same

2    special assessments.  Special assessments in the amount of 100

3    and 5,000 and up to 17,000 restitution, registration as a sex

4    offender.  Do you understand the penalties?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  You have important constitutional rights

7    in the case.  When we were here last time we talked about a

8    couple of them, your right to remain silent, your right to a

9    lawyer, which you now have.  You have other important rights,

10   including the right to be presumed innocent, the right to have

11   the government prove you guilty beyond a reasonable doubt on

12   each and every element of these charges.  That would occur at a

13   speedy and public trial before 12 jurors drawn from the

14   community.  At trial you'd have the right, through Mr. Fisher,

15   to confront and cross examine the government's witnesses, to

16   call your own witnesses and have the Court order them to appear

17   and testify.  You would have the right to present other

18   evidence which you believe demonstrates you are not guilty of

19   these charges, and finally, you would have the right to either

20   take the witness stand and testify in your own defense or

21   remain silent and not have your silence used against you in any

22   way.  We are going to project up on the screen now a form which

23   summarizes your constitutional rights.  Is that your signature

24   near the bottom of the form?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Did you read and understand the form

2    before you signed it?

3          THE DEFENDANT:  Yes, Your Honor.

4          MR. FISHER:  Your Honor, I am not sure if this was

5    covered at the last hearing, but Mr. Densmore has a very

6    difficult time seeing.

7          THE COURT:  Do we have a --

8          THE DEFENDANT:  I am sure it's fine.

9          THE COURT:  Well, we need to be --

10          MR. FISHER:  I can confirm that I did see him sign it,

11    Your Honor.

12          THE COURT:  Okay.  All right.  Do you understand the

13    rights you have in this case, Mr. Densmore?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.  There are four ways that you

16    can plead to this charge.  The first is not guilty.  Second,

17    you could say nothing or stand mute.  If you did that I would

18    enter a not guilty plea on all of the charges for you.  Third

19    you could plead guilty, and fourth, with the consent of chief

20    Judge Hala Jarbou and the consent of Mr. Townshend you could

21    plead something called no contest, which has essentially the

22    same effect as a guilty plea.  Do you understand your four

23    options?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  I am going to ask Mr. Fisher to enter a

1      plea for you now on these charges.

2             MR. FISHER:  Not guilty, Your Honor.

3             THE COURT:  All right.  Not guilty pleas will be

4      entered on all charges.

5             Mr. Densmore, that concludes the arraignment.  We are

6      going to turn to the pretrial conference.  Mr. Fisher has filed

7      a pretrial conference form with me.  On that form he is asking

8      that if your case goes to trial it be a trial by jury, and he

9      has agreed on your behalf to provide the government any

10     information which you are obligated by law to provide, and

11     there isn't much in that.

12            Mr. Townshend, questions for Mr. Fisher?

13            MR. TOWNSHEND:  No, Your Honor.

14            THE COURT:  Mr. Townshend filed a longer form on

15     behalf of the United States.  In that form he summarizes the

16     evidence the government has against you.  Now, Mr. Fisher will

17     have an opportunity to review the evidence or get copies of it.

18     After he does that I'm sure he'll go through all that with you

19     carefully.

20            The government claims it has written records of oral

21     statements made by you, in other words, things you said,

22     contained in a February 2nd, 2023 interview.

23            THE DEFENDANT:  That's just me asking for an attorney.

24            THE COURT:  Is that the right date?

25            MR. TOWNSHEND:  That is correct, Your Honor.  Yes.

1    THE COURT:  That was a law enforcement interview?

2    MR. TOWNSHEND:  It was, Your Honor.  There were two

3    search warrants executed in this case.  The February 2nd, 2023

4    statement, again, is the invocation of Miranda, but there is a

5    recorded interview of that.  That was made at the first search

6    warrant, and then there was a second search warrant that was

7    executed last week at which time Mr. Densmore was arrested.

8    THE COURT:  Okay.  Government also claims to have

9    recorded statements which it claims you made including chats

10   involving Rabid, which I think the government believes is some

11   kind of screen name that you have used.  Recordings of the

12   person who identifies himself as Rabid.

13   The government is looking into your prior criminal

14   record.  I don't think there is any, but if they find anything

15   they'll turn that over.

16   The government has other evidence, including agent

17   reports and interview summaries, electronic evidence seized

18   from execution of search warrants, photographs and physical

19   evidence from those same searches, victim interview recordings,

20   a complaint to law enforcement.

21   Who would the makers of those complaints be,

22   Mr. Townshend?

23   MR. TOWNSHEND:  Your Honor, there is different

24   categories of those.  The complaints primarily come from either

25   victims themselves or from other users on the Internet, unknown

1    specific identities, or unknown to the government, but other

2    people in these chat rooms who are aware of this behavior and

3    filed complaints to law enforcement.

4    THE COURT:  Okay.  The results of subpoenas, Discord

5    data, Snapchat data, open sources research.  There is also data

6    extracted from the Motorola phone, the iPhone, data extracted

7    from victim No. 1's phone, also of somebody, victim No. 2,

8    forensic extraction of phones seized during execution of the

9    recent search warrant.  There were a number of search warrants

10    executed, including these were federal warrants that -- for the

11    Discord information.  Discord is some kind of platform, right?

12    Internet?

13    MR. TOWNSHEND:  That's correct, Your Honor.  It's an

14    on-line discussion platform.

15    THE COURT:  With a Snapchat account, a search of ████

16    ██████████████████ it looks like maybe twice, Mr. Townshend

17    made a reference to.  In those search warrants the returns,

18    inventories of any evidence seized will be part of the

19    information provided to Mr. Fisher.

20    The government has other evidence which it will

21    produce in the near future.

22    The government is also asking for a jury trial.

23    Estimates it'll last two days.

24    Finally, there is a plea negotiation policy you should

25    be aware of.  If you intend to have Mr. Fisher try to negotiate

1  a plea bargain for you in the case to ensure you get the

2  maximum benefit from any plea bargain, it would have to be

3  finalized at least two weeks before the date set for trial.

4  Mr. Fisher will keep a close eye on that date and all the other

5  dates for you, and I am sure he'll talk to you about whether or

6  not it makes sense to attempt a plea bargain given your

7  specific situation.

8          Mr. Fisher, questions for Mr. Townshend?

9          MR. FISHER:  None, Your Honor.

10         THE COURT:  Mr. Townshend, I am going to give the

11  government the Rule 5(f) notice now.  Pursuant to the Due

12  Process Protections Act the court reminds the government of its

13  obligations under the 1963 United States Supreme Court case of

14  Brady versus Maryland to disclose evidence favorable to the

15  Defendant and material to the Defendant's guilt or punishment.

16         The government is ordered to comply with Brady and its

17  progeny.  The failure to do so in a timely manner may result in

18  consequences, including dismissal of the indictment or

19  information, exclusion of government evidence or witnesses,

20  adverse instructions, dismissal of charges, contempt

21  proceedings, sanctions by the Court, or any other remedy that

22  is just under the circumstances.

23         Does the government commit to honoring its obligations

24  under Brady and the act?

25         MR. TOWNSHEND:  Yes.  It does, Your Honor.

THE COURT:  Mr. Densmore, that concludes the pretrial conference, leaving only the bond hearing.

Mr. Townshend, is the government prepared to proceed on bond?

MR. TOWNSHEND:  Yes, Your Honor.

THE COURT:  All right.  Mr. Townshend -- or Mr. Densmore, we are going to have a bond hearing here momentarily.  There are two issues in a bond hearing.  The first -- well, in no particular order I suppose, but the first I am going to talk about is the risk of nonappearance.  The government has the burden on both issues.

On the issue of risk of nonappearance the government's burden is something we call a preponderance of the evidence. That means there is just slightly more evidence suggesting that a defendant is a risk of nonappearance than evidence to the contrary.

The other issue is danger to the community.  The government's burden on that issue is higher.  It's something we call clear and convincing evidence, and requires more evidence from the government.

The rules of evidence that apply in a trial do not apply in a bond hearing.  So things like hearsay evidence, which would not be admissible in a trial, are admissible in a bond hearing.  In fact, even if the government obtained evidence against you illegally, and I don't have any reason to

1    believe that it did, but even if it did, that evidence would

2    probably come in for our purposes this afternoon.

3          Second, neither the government nor you have to produce

4    evidence by putting witnesses on the witness stand.  You can do

5    it instead using a procedure we call a proffer.  What that

6    means is the lawyers tell me facts which I then consider as if

7    they had come from a witness on the witness stand.

8          I note for the record I have read the pretrial

9    services report.  It appears in the Court's record at ECF 10.

10   After investigation, pretrial services believes that there are

11   conditions or combination of conditions that would ensure

12   Mr. Densmore's appearance and the safety of the community, and

13   thus recommends release subject to a host of conditions.

14         Mr. Townshend, the burden is on you.  The floor is

15   yours.

16         MR. TOWNSHEND:  Thank you, Your Honor.  The government

17   will call FBI Special Agent Reese McIntyre.

18         REESE MCINTYRE, GOVERNMENT

19         having been first duly sworn, testified as follows:

20         (Witness sworn, 2:42 p.m.)

21         MR. TOWNSHEND:  Your Honor, just for planning

22   purposes, what the government intends to cover today is a

23   little bit about the information that ties Mr. Densmore to this

24   user name Rabid, the information that was found on his phones

25   in February of 2023, and then information that was found on his

1    phone just last week in January of '24, and -- and I think

2    the -- the arguments on dangerousness in particular is what --

3    what we are looking to address.

4         THE COURT:  Okay.

5              DIRECT EXAMINATION

6    BY MR. TOWNSHEND:

7    Q    All right.  Agent McIntyre, would you please state and

8    spell your name?

9    A    Agent Reese McIntyre, R-e-e-s-e.  Last name is McIntyre,

10   M-c-I-n-t-y-r-e.

11   Q    Where do you work?

12   A    The Federal Bureau of Investigation.

13   Q    How long have you been there?

14   A    I have about there for approximately five years.

15   Q    And what are your job responsibilities?

16   A    To investigate federal law violations under multiple U.S.

17   codes, specifically include sexual exploitation and child

18   pornography charges.

19   Q    Have you been involved in the investigation of Richard

20   Anthony Reyna Densmore?

21   A    Yes.  I have.

22   Q    And does that investigation concern violations of Title 18

23   of the United States Code concerning sexual exploitation of

24   children and related offenses?

25   A    Yes.  It does.

1    Q    Is Mr. Densmore seated here to my right?

2    A    Yes.  He is.

3    Q    How do you know that that's Mr. Densmore?

4    A    From driver's license photos, and from the arrest last

5    week, and seeing him in person, and then a year ago as well at

6    the previous search.

7    Q    Are you the lead case agent on this investigation?

8    A    No.  I am not.

9    Q    All right.  You mentioned did you participate in two search

10   warrants at ████████████████████ in ██████?

11   A    Yes.  I did.

12   Q    Those warrants executed on/or about February 2nd of 2023

13   and January 31st of 2024?

14   A    Yes.

15   Q    And as part of your participation in those search warrants

16   were you briefed on this investigation?

17   A    Yes.  I was.

18   Q    As part of your participation did you also review reports

19   and other materials relating to the investigation of

20   Mr. Densmore?

21   A    Yes.  I did.

22   Q    Based on the briefings you received and everything that you

23   have reviewed to date, are you generally familiar with the

24   investigation and proofs that have been developed?

25   A    Yes.  I am.

Q    All right.  I want to talk a little bit about some initial complaints that came in in August of 2022.  Did the FBI's National Threat Operations Center receive complaints about a Discord user name Rabid around that time?

A    Yes.

Q    What were the nature of those complaints?

A    The nature of those complaints included this user who they were actually were able to identify, if I recall correctly, by name, and his address, which was the Defendant's, stating that he was operating a server on Discord that consisted of grooming or attempting to get child pornography from minors, and it also included getting self-harm content as well.

Q    And -- and tell me what you mean by self-harm content?

A    Self-harm in the sense that these users would get minor victims to actually cut themselves, say, for example, with a razor blade on her extremities, whether their arms or legs or anywhere on their body, and they could ask them to cut their user name or -- or a symbol or something like that.

Q    Okay.  I want to talk a little bit about the evidence tying Mr. Densmore to Rabid.  As part of this investigation, did law enforcement interview a minor girl in the state of Texas?

A    Yes.

Q    Did that girl confirm that she sent pictures of her breasts to the user Rabid on Discord?

A    Yes.  She did.

Q    And were those girl's devices -- her electronic storage
devices obtained and imaged as part of this case?

A    Yes.  They were.

Q    On those images, did the Texas victim -- the Texas girl
identify a screenshot of a recording of -- of a discussion with
Rabid?

A    Yes.

Q    I am going to show you in your binder in front of you, or
your looseleaf materials there, what's been marked as Exhibit
1.  What is this exhibit?

A    This is side-by-side images of the Defendant's driver's
license photo on the right and on the left a screenshot from
that video.

Q    And again, the left screenshot is from the minor girl in
Texas?

A    Correct.

Q    Who -- who stated that this was Rabid as she was
interacting with on Discord?

A    Yes.  That's correct.

Q    Based on your participation in this investigation, Agent
McIntyre, who do you believe Rabid on the left to be?

A    We believe that to be the Defendant and also the picture on
the right, Mr. Densmore.

Q    Now, you mentioned you participated in the search warrants
in this case.  Who lived at ███████████████████ in ███████,

Michigan?

A    The Defendant, Mr. Densmore, and his grandmother.

Q    Okay.  Just the two of them?

A    Yes.

Q    All right.  Now, at that search warrant were there hard copy documents that were seized in addition to electronic storage devices?

A    Yes.  There were.

Q    I am showing you Exhibit 2 --

        MR. TOWNSHEND:  And Your Honor, I should move to admit Exhibit 1.  I failed to do so, and I am sorry.

        THE COURT:  Any objection, Mr. Fisher?

        MR. FISHER:  No, Your Honor.

        THE COURT:  It's in.

BY MR. TOWNSHEND:

Q    All right.  Now, Exhibit 2, what is that, Agent McIntyre?

A    This is a military photo, I believe, of the Defendant, and then also a note with the name Rabid on it, and then another picture of what is believed to be the Defendant.

Q    And where were these materials seized?

A    In the safe of the room where it was believed that he resided in.

        MR. TOWNSHEND:  Your Honor, I move to admit Exhibit 2?

        THE COURT:  Objections?

        MR. FISHER:  Your Honor, just make a standing no

1    objection.

2          THE COURT:  Okay.

3    BY MR. TOWNSHEND:

4    Q    Agent McIntyre, was this the only time in this

5    investigation that law enforcement saw that handwritten note

6    Rabid and that military photo of Mr. Densmore?

7    A    No.

8    Q    Where else did law enforcement find those materials?

9    A    They were discovered on a search warrant return from

10   Discord.  It was on one of the Rabid accounts from Discord.

11   Q    And these notes and at least a partial photo in military

12   dress appear to be sent by the user Rabid from certain Discord

13   accounts, is that right?

14   A    That's correct.

15   Q    Okay.  Agent McIntyre, are these the only ways that law

16   enforcement tied Rabid to Mr. Densmore?

17   A    No.

18   Q    Okay.  All right.  I am going to shift gears and talk a

19   little bit about Rabid's on-line activities.  Agent McIntyre,

20   was a girl from Illinois, initials M.R., interviewed as part of

21   this investigation?

22   A    Yes.

23   Q    And in August 2022, was M.R. about 15 years old?

24   A    Yes.

25   Q    Did M.R., Agent McIntyre, recall meeting Rabid on Discord

1    around August of 2022?

2    A    Yes.  She did.

3    Q    Did she confirm that she told Rabid her age?

4    A    Yes.  She did.

5    Q    Agent McIntyre, did M.R. subsequently learn what Rabid's

6    real first name was?

7    A    Yes.  She did.

8    Q    And what was that?

9    A    Richard.

10   Q    Did M.R. describe a server or chat room called sewer, on

11   Discord?

12   A    Yes.  She did.

13   Q    And who did M.R. say created that server or chat room?

14   A    The user Rabid, and also associated that with Mr. Densmore,

15   Richard.

16   Q    And what was the primary purpose of that sewer server?

17   A    To have content related to self-harm and essentially

18   producing those child pornography type images and videos.

19   Q    What, if anything, did Rabid tell M.R. to do in that

20   server?

21   A    He told her and requested of her to do -- to make that sort

22   of content on the server.

23   Q    Did he also tell her to solicit other people to stream that

24   content?

25   A    Yes.  He did.

Q    Did M.R., in fact, engage in such conduct?

A    Yes.  She did.

Q    Agent McIntyre, did you review Exhibit 3 before coming into Court today?

A    Yes.  I did.

Q    I'll note for the record I have that in a sealed envelope here at the lectern, but can you describe generally what Exhibit 3 shows?

A    It is a video of the victim who is -- she has sitting back and it's a -- she is exposing her vagina and anus, and she is using an ice cube and inserting it into her vagina.

Q    And Exhibit 3, is that a screenshot from that video?

A    Yes.  It is.

Q    Does that screenshot appear to be from the sewer chat room on Discord?

A    Yes.

Q    Does the user Rabid appear to be in attendance in that chat room?

A    Yes.  It does.

Q    And when you say victim, Agent McIntyre, are you referring to M.R.?

A    Yes.  I am.

Q    Was M.R. shown a screenshot from this video during her interview?

A    Yes.  She was.

Q    Did she confirm that this was, in fact, her in that video?

A    Yes.

Q    And that she was under age at the time?

A    Yes.

        MR. TOWNSHEND:  Your Honor, I'll move to admit Exhibit 3?

        THE COURT:  It's admitted.

BY MR. TOWNSHEND:

Q    Now, Agent McIntyre, was that video that you have just described found on a Motorola cell phone that was seized during the February 2023 search warrant?

A    Yes.

Q    And where was that phone found?

A    The -- that phone was found located either on the bed or next to the bed in the room of the Defendant.

Q    On that same phone, Agent McIntyre, did law enforcement find evidence of cutting and fan signing?

A    Yes.

Q    And describe generally what that is?

A    Fan signing is -- so if you know someone's user name was John, then that user name could ask that individual to put their, you know, user sign, John, and write it on their body. So they would write John on whatever body part that you requested.

Q    And would those fan sign, would it be written and also cut

into the -- into the skin?

A    Yes.  It could be written or cut, correct.

Q    Was there evidence of both on that Motorola phone that was seized?

A    Yes.

Q    Okay.  Was there also material, Agent McIntyre, on that Motorola phone related to a group called 764?

A    Yes.

Q    What is that?

A    764 is, from my understanding, is a satanic group or sometimes referred to as a cult, that centers on a grooming or targeting minors or juvenile victims into creating the self-harm material, and also producing video or picture images of child pornography.

Q    And the material on that Motorola phone again seized in February of 2023, was that consistent with the activities of 764 as you have described?

A    Yes.  It was.

Q    And based on your knowledge of this investigation, did the Defendant, Mr. Densmore, claim affiliation with that group, 764?

A    Yes.

Q    I am showing you Exhibit 6, and I apologize for jumping around.  What is Exhibit 6?

A    Exhibit 6 is an FBI public service announcement issued on

1    September of 2023.

2    Q    And what does that public service announcement pertain to?

3    A    Specifically it addresses violent on-line groups to include

4    764 and others.

5              MR. TOWNSHEND:  All right.  Move to admit Exhibit 6,

6    Your Honor?

7              THE COURT:  It's admitted.

8    BY MR. TOWNSHEND:

9    Q    All right.  Agent McIntyre, was the Defendant,

10   Mr. Densmore, home at the time of the search warrant in

11   February of 2023?

12   A    Yes.  He had just departed the residence in his vehicle,

13   and we interacted with him after leaving his residence.

14   Q    And do you recall whether the FBI left a property receipt

15   with Mr. Densmore showing that his electronic storage devices

16   had been taken --

17   A    Yes.

18   Q    -- as part of that search warrant?

19   A    That is correct.

20   Q    Now, you mentioned this earlier.  Did you participate in

21   the search warrant at the ███████████████ residence last week

22   on January 31st?

23   A    Yes.  I did.

24   Q    And did you find additional devices in the residence at

25   that time?

1    A    Yes.  I did.

2    Q    Did you also find guns and ammunition?

3    A    Yes.  I did.

4    Q    And a crossbow?

5    A    Yes.

6    Q    Agent McIntyre, I am showing you Exhibit 4.  Can you

7    describe at least what the first two pages of that exhibit are?

8    A    First two pages are photographs of an air vent inside the

9    room of Mr. Densmore with the air vent cover removed, and then

10   the second picture you can see down inside the air vent there

11   was two cellular phones located down inside the vent.

12   Q    And can you tell us just generally what the remaining three

13   pages of these photos indicate?

14   A    Last three photos is a Ruger, 308 Winchester rifle that was

15   located in the room, a crossbow with arrows also located in the

16   room, and ammunition also for that 308 Winchester rifle that

17   was located in the room.

18   Q    Agent McIntyre, did the agents seize the rifle, ammunition

19   and crossbow at the time of the search warrant?

20   A    No.

21   Q    As far as you know are they still at the Defendant's

22   residence?

23   A    Yes.

24        MR. TOWNSHEND:  Your Honor, move to admit Exhibit 4?

25        THE COURT:  They are admitted.

BY MR. TOWNSHEND:

Q    Now, Agent McIntyre, you mentioned the phones in the air vent.  Was one of those a Samsung phone?

A    Yes.  It was.

Q    And was that phone unlocked?

A    Yes.

Q    To date have you been able to review at least a partial extraction of materials from that phone?

A    Yes.  I have.

Q    All right.  I am going to show you Exhibit 5.  Can you tell me generally what these pictures are?

A    First photograph is a black square with 867 written in it.

Q    Okay.  And what about the next pages?

A    The next one is a female, possibly a minor, written with Rabid on her forehead.

Q    And what about the third page?

A    Third page appears to be two legs of a female, and the red marks on her leg appear to be indicative of self-harming.

Q    Yup.  And what about the last page?

A    And the last one is the chest of a female, and it looks -- appears that there's been self-harm to her chest, and etched am R and then some other sort of a symbol, and that is blood dripping down from those cuts.

        MR. TOWNSHEND:  Your Honor, move to admit Exhibit 5?

        THE COURT:  They are admitted.

BY MR. TOWNSHEND:

Q    And again, Agent McIntyre, as we noted, there has just been a partial extraction of this phone to date, but the images on that phone that you have been able to review to date, the phone that was seized last week, is that also consistent with the activities of groups like 764 as you have described them?

A    Yes.

        MR. TOWNSHEND:  Okay.  Your Honor, I don't have any further questions.

        THE COURT:  Mr. Fisher, cross examination?

        MR. FISHER:  Briefly, Your Honor.

                    CROSS EXAMINATION

  BY MR. FISHER:

Q    Starting with the images that you just referred to, Agent, you don't know the identity of the lady with the words Rabid on her forehead?

A    No.  I do not.

Q    And the same thing with the next picture?

A    That's correct.  I do not.

Q    And the same thing with the third picture?

A    I'm sorry, which one?

Q    The third picture.

A    Oh, correct.

Q    So none of those are identified victims?

A    No.

Q    As far as you know, none of these are associated with either one of the listed victims in the indictment?

A    No.

Q    Okay.  You said you also found a firearm and a crossbow during the execution of the search warrant?

A    Yes.

Q    You did not seize those because they weren't part of the search warrant or was there another reason?

A    That's correct.  They were not listed as part of the search warrant to seize.

        MR. FISHER:  Okay.  Nothing further, Your Honor.

        MR. TOWNSHEND:  Nothing further on the government's behalf, Your Honor.

        THE COURT:  All right.  Additional evidence?

        MR. TOWNSHEND:  Nope.  This is it, Your Honor.

        THE COURT:  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        (Witness excused, 2:58 p.m.)

        THE COURT:  Mr. Fisher, evidence?

        MR. FISHER:  No, Your Honor, just argument.

        I would ask the Court take notice of the pretrial services report.  I am going to adopt that as our evidence in this case.

        THE COURT:  Okay.  Mr. Townshend, argument?

        MR. TOWNSHEND:  Your Honor, the Court, I am sure,

1    knows there is a rebuttable presumption here of detention under

2    § 3142(e)(3)(E) based on the offenses, probable cause of the

3    offenses charged.  I do not think the Defendant can rebut that

4    presumption.

5         Even if this wasn't a rebuttable presumption case I

6    think what the government has established through Agent

7    McIntyre's testimony is that even after Mr. Densmore's devices

8    were taken in February of 2023, he obtained new devices, hid

9    them in his bedroom, and those devices appear to contain at

10   least some of the same sorts of activities of cutting, fan

11   signing, 764 related activity as the phones that were seized in

12   2023, and the government is particularly concerned about that

13   and believes that that's sufficient to establish his ongoing

14   danger to the community, in addition to the firearms and

15   crossbows that were seized from the residence.

16        THE COURT:  There is nothing illegal about his

17   possession of the firearms or crossbow I take it?

18        MR. TOWNSHEND:  Not that I am aware of, Your Honor.

19   The government is concerned, though, that in combination with

20   the violent images, the cutting, and those sorts of things on

21   the phone, that the Defendant may have violent proclivities,

22   but there is nothing specifically about him that's prohibiting

23   him from owning those materials.

24        THE COURT:  All right.  As far as the government knows

25   he has no criminal history?

1    MR. TOWNSHEND:  That's correct, Your Honor.

2    THE COURT:  All right.

3    MR. FISHER:  Your Honor, as to the weapons, I believe

4  pretrial services interviewed Ms. Dove, who indicated that she

5  believed that the firearm was removed already, and if it hasn't

6  been I believe that she is capable of taking possession of it

7  and removing it from the home, as well as the crossbow.  So I

8  think that eliminates any risk.

9    I'd also point out that there is no indication of

10  Mr. Densmore engaging in interpersonal violence whatsoever

11  documented in the pretrial services report.  So I think that

12  does rebut the government's contention that the possession of

13  these lawfully possessed weapons creates any sort of danger on

14  the part of Mr. Densmore.

15    As to the fact that Mr. Densmore subsequently obtained

16  cellular phones after the initial search warrant, as near as I

17  can tell, the government didn't arrest Mr. Densmore during the

18  2023 search warrant execution.  The fact that he subsequently

19  obtained electronic devices may have been unwise and may have

20  provided the government with additional information to charge

21  Mr. Densmore with the crimes with which we are here today, but

22  he was by no means under any judicial order to refrain from

23  participating in on-line chat groups or from possessing

24  electronic devices, whereas the Court can order that he refrain

25  from doing so today if the Court determines that he is eligible

1    for release.

2          What I would say is if it were the Stone case, the

3    government's argument hinges essentially on Mr. Densmore's

4    dangerousness to the community if released on bond, and they

5    are hinging that argument primarily based upon the conduct of

6    these chat rooms and the allegations in the indictment that the

7    government has proffered evidence about today.  But those, as

8    the Court is well aware, are afforded the least weight when

9    assessing somebody's danger to the community because

10   Mr. Densmore is presumed innocent of these charges, and what we

11   have in terms of the actual evidence is three pictures of

12   unknown victims or witnesses that aren't necessarily even

13   minors.  We have no way of knowing, and the agent didn't

14   testify that he knows that they are minors.  We have interviews

15   with two women, young women, who did identify Mr. Densmore, and

16   we have one picture that the government has produced via

17   proffer today, which I have seen and agree that it does contain

18   what appears to be CSM materials.

19         With that said, Your Honor, that doesn't indicate that

20   Mr. Densmore, if ordered released on bond, would be an ongoing

21   danger to the community, an ongoing risk of engaging in these

22   types of activities or a danger to the community in general.

23   He has no criminal history.  He has a job at the Easy Mart.

24         He appears to be disabled and -- in terms of his

25   eyesight significantly impeding his ability to engage in any

1    sort of harm or conduct that would be detriment to the safety

2    of any other person or any other witnesses.

3        And I think that the evidence here only goes to the

4    evidence of the case, and that is not what this issue in terms

5    of the bail determination is ultimately about.  It is about

6    whether the Court can impose conditions or combinations of

7    conditions that would reasonably protect the community from

8    Mr. Densmore.  I think that's abundantly clear that the Court

9    can.  Limiting device activity like what pretrial services

10    suggests, making sure that Mr. Densmore's home is free of any

11    weapons and that he does not have contact with any children,

12    which apparently is not an issue because he has no minor

13    children of his own, does not reside in a home with access to

14    any minor children will all reasonably assure the community of

15    Mr. Densmore's safety.

16        Again, this is an issue about reasonably assuring the

17    community and the Court not protecting the community from all

18    possible risk, and in this case the risk is very slight.  The

19    behavior is engaging in Internet related activities with

20    admittedly apparently unsavory elements of society.  The Court

21    can limit his access to the Internet, and if pretrial services

22    discovers that he has access to the Internet simply throw him

23    in jail, and that's the solution to this particular problem,

24    Your Honor.

25        THE COURT:  Mr. Fisher, although I have to give it the

1    least weight because Mr. Densmore is cloaked in the presumption

2    of innocence, I can consider the offense conduct in reaching my

3    bond decision.

4         MR. FISHER:  I think the Court can consider it as to

5    the risk of danger to the community but not in terms of

6    weighing whether or not the government has overwhelming

7    evidence of Mr. Densmore's guilt, and the government's evidence

8    in this case is that he behaved in potentially --

9         THE COURT:  I don't need to do that to make a bond

10   decision, right?

11        MR. FISHER:  What?

12        THE COURT:  I don't need to reach a conclusion about

13   whether the government's evidence is overwhelming.  I just have

14   to decide does he pose a danger that I can't mitigate through

15   conditions?

16        MR. FISHER:  That's correct, Your Honor.  But I think

17   that the objective facts that the government has presented

18   create the ability for this Court to impose conditions.

19        THE COURT:  All right.  Thank you.

20        Mr. Townshend, I -- I think this question was answered

21   when I asked whether the government had any evidence that

22   Mr. Densmore had been convicted of prior crimes, but does the

23   government have any evidence that Mr. Densmore has ever engaged

24   in any kind of hands-on conduct with -- misconduct or criminal

25   conduct with children?

1    MR. TOWNSHEND:  Your Honor, the government is aware

2  and has produced over the weekend a report relating to what I

3  believe is a 2017 CSC offense, although Mr. Densmore did

4  receive HYTA for that.  That is the only hands-on touching that

5  the government is aware of from around 2017.  I believe

6  Mr. Fisher may have that report there.

7    MR. FISHER:  1997, Your Honor.

8    MR. TOWNSHEND:  1997.

9    MR. FISHER:  I believe it was a juvenile adjudication

10  and a previous version of HYTA that does not require a

11  conviction, which is why it doesn't show up in the NCAC.

12    THE COURT:  How -- so '97.  How old -- well, I guess

13  he could have reached back further.

14    MR. FISHER:  The conviction date I have is March --

15    THE COURT:  I went to law school because I am no good

16  at math.  Yeah.  So 26 years back.  How would that be a

17  juvenile conviction?

18    MR. FISHER:  That's my understanding from speaking

19  with my client, Your Honor, it was a juvenile adjudication.

20    THE COURT:  Well, I guess Holmes, if I remember, we

21  don't have any -- Mr. Valentine just left.  He could have

22  answered this question.  I think Holmes reaches forward to age

23  21.

24    OFFICER SCHULTZ:  Excuse me, Your Honor.  I have been

25  working in state court.  So sorry.  There was an age

1    restriction for Holmes Youthful Trainee Act was between 24 and

2    26 depending on the year in which they --

3              THE COURT:  Interesting.  All right.  Officer Schultz,

4    can I see you in chambers?  We are going to take a short pause.

5    You can keep everybody in place.

6              (Recess taken, 3:06 p.m.)

7              (Resume Proceeding, 3:13 p.m.)

8              THE CLERK:  Court is back in session.  Please be

9    seated.  Government's -- or government.  The Court's

10   consideration of bond begins with the Eighth Amendment to the

11   constitution, which prohibits excessive bail.  The Eighth

12   Amendment protections are made statute beginning in the Bail

13   Reform Act -- in the Bail Reform Act beginning at 18 United

14   States Code § 3141, § 3142 of which requires the Court to

15   release a Defendant on bond unless the Court concludes that

16   there is no condition or combination of conditions that will

17   reasonably assure the Defendant's appearance and safety of the

18   community.  Certain federal crimes give rise to a presumption

19   that there is no condition or combination of conditions.  This

20   is one of them.

21             Section 3142(g) of the act lays out the specific

22   offense -- the specific factors I am to consider in reaching my

23   decision, including the nature and circumstances of the

24   offense.  Specifically, does it involve violence or drug

25   dealing?  Well, it doesn't involve drug dealing but it is a

crime of violence.

Second, the weight of the evidence against the Defendant.  I would say that the weight of the evidence, based upon my understanding of it, which is entirely from what I have learned in court today, is fairly heavy.  This factor, however, is accorded the least weight in my balancing because Mr. Densmore remains cloaked in the presumption of innocence.

Other factors I consider include the history and characteristics of the Defendant, his character, physical and mental condition, family ties, employment history, financial history, community ties, history of drug or alcohol use.

Mr. Densmore is 47, born in San Antonio, Texas.  When he was two years old his dad died and his mom moved them here to Michigan.  Spent some time living between South Carolina and Michigan between '01 and '07.  Presently lives with his grandmother as we have heard.

He was married to Karen Densmore but they divorced seven years later.  He has no children.  No minor children visit his grandmother's home.

His grandmother has advised that the firearm is out of the house.  She thought it had been confiscated.  I am guessing that that's not the case, but whatever, it's out of the house according to her.  The crossbow is still there.

Mr. Densmore does not have a current passport.  He had a passport at some time when he was traveling to Europe and the

middle east during his time in the army.

As we have heard, he is presently working at the Easy Mart it Onekama.  His financial situation is unremarkable.  No significant assets or liabilities.

His grandmother apparently has been diagnosed with Alzheimer's and can't live alone, so he provides some value to her, his presence.

His overall physical health is good except his eye sight, which is impaired in some significant way.  His grandmother believes it's because he needs a cornea transplant.

Mental health history is -- is more concerning.  He was diagnosed with schizophrenia and borderline personality disorder while in the military.  He believes he suffers from manic depression.

He has a history of -- self-reported history of suicide by alcohol.

He was institutionalized for two months in Germany and spent over six months in Walter Reed upon his return to the United States from his military service.  It is not entirely clear the reasons for that, but it appears likely to me that those were issues related to mental illness.  He says that he was honorably discharged from the service.

Other factors I can -- there is really no history, no significant history of substance abuse.

Prior criminal history, of course, is always an

1    important factor in my analysis.  He admits that he had a

2    Holmes Youthful Trainee Act disposition to some state court

3    offense.  It's unclear what it was or really when the conduct

4    occurred, but it was a long time ago, 26 plus years ago.  No

5    evidence that he has failed to appear.  Holmes would impose

6    conditions upon essentially a probationary period.  And I guess

7    all I can say is we don't have any information about it, but we

8    also don't have any information that he violated those

9    conditions.  If he violated it, enough of them, or seriously

10   enough, he would -- they would have withdrawn Holmes, thrown

11   him out of the program, and he'd have a -- he'd have had a

12   choice, I suppose, to go to trial or plead guilty, and there

13   would be a record.  So I guess we can deduce from that that he

14   did okay on Holmes.

15        As I said earlier, pretrial services, after

16   investigation, concludes that there are conditions or

17   combination of conditions to ensure that Mr. Densmore appears

18   and that the community is safe and recommends release.

19        Mr. Townshend argues, largely based on the conduct in

20   the case, and the evidence found in the two searches I suppose,

21   that Mr. Densmore poses an ongoing risk to children in the form

22   of continuing the conduct underlying this case.  We have no

23   evidence that Mr. Densmore has ever committed any kind of a

24   hands-on offense with a child.  We have no evidence that

25   Mr. Densmore has ever engaged in violence of any kind for that

1    matter, and no evidence of any kind of misuse of a weapon or

2    use of a weapon.  The gun and the crossbow were in the house.

3    No question about that, but there was nothing illegal about

4    their mere presence there.  He could lawfully possess them at

5    that time.

6         I know that my colleague, Judge Scoville, would often

7    say to the government, more often in the drug context, that

8    when the government is aware of drug activity and takes no

9    action for an extended period of time it undercuts the

10   government's later argument that the Defendant poses a risk to

11   the community.  Because if the government really thought that,

12   why didn't they take action then?  I think that same question

13   is a fair question in this case.  There was a search and -- a

14   year ago, and evidence was found, and the government took no

15   action.

16        In terms of protecting the community, if I release

17   Mr. Densmore, granted, Internet usage is one of the hardest

18   conducts to police.  You know, I can order him, and I will

19   order him to have no access to the Internet, but you know,

20   people are ingenious in the ways that they think of to end run

21   those kind of requirements.  Obviously, Mr. Densmore is hiding

22   cell phones in his vents in his home.  Who knows what other --

23   what else is hidden in the house in other places.  There may be

24   a whole host of cell phones in there.  I don't know.  That's

25   concerning.

1      The government does not allege that Mr. Densmore is a

2  risk of flight.  It would be a very difficult argument to make

3  in any event.

4      It's my finding, based upon the evidence before me,

5  that the government -- that -- that Mr. Densmore has overcome

6  the presumption.  The government has not proven that he poses a

7  risk or danger to the community that cannot be reasonably

8  mitigated through conditions.

9      Mr. Densmore, I am going to release you on bond

10  subject to a whole host of conditions --

11      THE DEFENDANT:  Thank you.

12      THE COURT:  -- which are outlined in the pretrial

13  services report.  Most importantly, you are going to have a GPS

14  bracelet on your ankle so we are going to know where you are at

15  all times.  You are going to be restricted to your home except

16  for express reasons which you will have to clear with your

17  probation officer ahead of time.

18      The probation/pretrial services officer will be

19  searching your grandmother's house unannounced at any hour of

20  the day -- of the day or night, and if there is any evidence

21  that you are accessing the Internet in any way, I am just going

22  to revoke your bond and lock you up.  Do you understand that?

23      THE DEFENDANT:  Yes, Your Honor.  What about work?

24  Can I go to work?

25      THE COURT:  I would say yes.  It'll be up to your

1    pretrial services officer.  So you are going to ask him all

2    those questions --

3                    THE DEFENDANT:  Thank you, Your Honor.

4                    THE COURT:  -- first.

5              All right.  And I am going to release you on a $10,000

6    unsecured bond.  What that means is you don't have to post any

7    money.  You don't have to go to a bail bondsman.  You simply

8    have to abide by the other conditions I impose.

9              There are standard conditions in every bond.  First

10   and foremost, you can't commit a crime while you are on bond.

11   With the exception of this and whatever happened in the Holmes

12   situation, you are 47 and we have no evidence that you have

13   ever committed other -- another crime, so hopefully that won't

14   be a problem.

15             You can't use or possess controlled substances.

16             You have to appear in all further proceedings in the

17   case.

18             If you are going to change your address, phone number

19   or employment situation, you'll need to contact your pretrial

20   services officer in advance.

21             If you have any contact with a police officer, even if

22   you are driving home from the -- you probably don't drive

23   because of your vision, right?  Let's say hypothetically you

24   are driving home from 711 and you get pulled over.  The officer

25   says your taillight is out.  I am not going to revoke your bond

1    because your taillight is out, but if you fail to tell your

2    pretrial services about that conversation between you and the

3    officer, I will revoke your bond.  Do you understand the

4    difference?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  I am going to restrict your travel to the

7    Western District of Michigan.  It's basically the west half of

8    the lower peninsula.

9           I don't see any need for drug testing or treatment.

10           You'll undergo mental health assessment and treatment

11    as directed by your probation officer.

12           It looks like you do a little bit of drinking so I am

13    going to order you not drink excessively.  It impairs your

14    judgment.

15           You can't possess a gun or other weapon, and the

16    crossbow will have to go as well.  And so just so we are clear,

17    if you have a gun in your hand you possess it.  If it's in your

18    pocket you possess it.  If it's in your car you possess it.  If

19    it's in your home you possess it.  If you possess a gun I am

20    revoking your bond, or any other dangerous weapon.  We clear on

21    that?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  So you say you do not have a current

24    passport?

25           THE DEFENDANT:  I never had a passport.  I had a

1  military ID that you can use as a passport.

2         THE COURT:  Where is the military ID now?

3         THE DEFENDANT:  I have a copy of my expired military

4  ID in my room.  I also have a copy of my VA card.

5         THE COURT:  All right.  Hold it right there.

6         Any concern about those documents?

7         MR. TOWNSHEND:  Not that I can think of, Your Honor.

8         THE COURT:  Okay.  That's all right.  You can hang

9  onto those.  Now, a whole host of conditions that have to do

10  with the charges in this case and the conduct that the

11  government believes you have been engaged in.

12         You can't have any computers in the home.  No Internet

13  access.  No -- no contact with minors.  No unsupervised contact

14  with minors.  I assume probably in the store you work in kids

15  come in and buy a Coke or whatever.  That's okay.  But no

16  contact outside your work -- work duties with kids.  Can't

17  possess any child pornography, or any pornography, hang out in

18  places where those kind of products are available.  You have to

19  avoid all contact with -- do we have any names, other

20  identifying -- nothing?

21         MR. TOWNSHEND:  I have some Discord user names but

22  nothing.

23         THE COURT:  He is not going to be on Discord so we

24  shouldn't have to worry about that.

25         MR. TOWNSHEND:  Okay.

1          THE COURT:  Or any other platform.  But I don't know

2     if you know, and don't say it one way or another, whether you

3     know any of these people who you were communicating with,

4     allegedly, who the government alleges you were communicating

5     with, but you can't have any contact with any of those people

6     period.  If they try to contact you, you don't respond.  Well,

7     you are not going to be on the Internet anyway so you won't

8     have any way to respond.  You can't have contact of any kind.

9          All right.  Next.  Okay.  Going to live with your

10    grandmother.  Do we have that address?

11          THE CLERK:  Yes.

12          THE COURT:  All right.  And you will be subject to

13    what we call home detention.  As I said, you'll have a GPS

14    bracelet on your ankle so we'll know where you are at all

15    times.  You are to stay home except for specific reasons, which

16    would have to be cleared in advance by your pretrial services

17    officer.  And you'll meet with the officer today before you

18    leave the building.  We'll give you a paper copy of this bond

19    to take with you.  Are we good for a signature?

20          Well, let me ask.  Mr. Townshend, additional

21    conditions?

22          MR. TOWNSHEND:  No, Your Honor.

23          THE COURT:  Officer Schultz additional conditions?

24          OFFICER SCHULTZ:  No, Your Honor.

25          THE COURT:  Mr. Fisher, additional conditions?

1          MR. FISHER:  No.  I am fine, Your Honor.  Thank you.

2          THE COURT:  All right.  Fire away there, Mr. Densmore,

3    anywhere on that screen.  All right.  Mr. Densmore, raise your

4    right hand.  I am going to have you placed under oath to abide

5    by the conditions of your bond.

6          (Defendant sworn, 3:31 p.m.)

7          THE COURT:  All right.  You can sit back down.  We are

8    going to print a paper copy.

9          Does he need to be processed?  Good to go?

10          Okay.  When we are finished in Court we'll hand you

11    your paper copy here.

12          Mr. Fisher, can you escort him down to pretrial

13    services?

14          MR. FISHER:  Of course, Your Honor.

15          THE COURT:  All right.  Mr. Fisher will take you down

16    there.  The marshals will unhook you and you'll be good to go.

17    Understand this, though, Mr. Densmore.  Mr. Townshend thinks I

18    am making a very bad decision in releasing you on bond.  You

19    put a toe over the line I am revoking your bond and locking you

20    up.  We clear?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Okay.  We will be adjourned.

23          (Proceeding concluded, 3:31 p.m.)

24

25

```
                                    INDEX


       Government Witnesses:                        Page

       REESE MCINTYRE

        Direct Examination by Mr. Townshend          13
        Cross Examination by Mr. Fisher              26


       Exhibits:                                 Admitted

       Government's Exhibit 1                        17
        (Side-by-side photograph of Defendant)
       Government's Exhibit 2                        18
        (Military Photograph of Defendant)
       Government's Exhibit 3                        21
        (Screenshot of M.R.)
       Government's Exhibit 4                        24
        (Photographs of Air Vent, Phones, Weapons, Ammunition)
       Government's Exhibit 5                        25
        (Photographs from iPhone)
       Government's Exhibit 6                        23
        (FBI Public Service Announcement)
```

C E R T I F I C A T E

    I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.



                            /s/ _____

                            Paul G. Brandell, CSR-4552, RPR, CRR

                            U.S. District Court Reporter

                            399 Federal Building

                            Grand Rapids, MI  49503